In the Matter of RUDOLPH HELFANT, an Attorney, Respondent.

First Department, March 10, 1930.

*Isidor J. Kresel* of counsel [*James Marshall* with him on the brief], for the petitioners.

*Floyd Wilmot* of counsel [*William P. Thomas* with him on the brief], for the respondent.

DOWLING, P. J. Respondent was admitted to practice as an attorney and counselor at law in the State of New York at a term of the Appellate Division of the Supreme Court of the State of New York, First Department, on June 13, 1918.

The petition charged respondent with misconduct as an attorney at law in soliciting retainers from persons with claims for damages

for personal injuries, and that in cases involving injuries to infants respondent failed to obtain court orders approving settlements and fixing the attorney's fees, and in other cases orders fixing fees were not complied with, and improper deductions were made.

Respondent denied generally the charges of the petition. The matter was referred to a referee, who has duly reported, and petitioners now move for such action as the court may deem just and proper.

The charges herein relate to respondent's practice while he was a member of the firm of Oppenheim & Helfant. Respondent became a member of that firm, in partnership with Benjamin Oppenheim, about six months after his admission to the bar in 1918, and the partnership continued until about August, 1928, when, following the ambulance chasing investigation and ensuing charges looking to the disciplining of Oppenheim, the latter resigned as a member of the bar.

The record discloses the testimony of a large number of witnesses establishing the employment by the firm of Oppenheim & Helfant of three or four solicitors, whose practice it was to call either at the home of the injured person or at the hospital, shortly after the accident, and induce the injured person or his parent or guardian to retain said firm to prosecute the claim for damages. The solicitors were equipped usually with newspaper clippings describing the success of respondent's firm in other cases, and with forms of retainers with the firm name printed therein. These witnesses testified that they had not previously known the firm of Oppenheim & Helfant, and most of them testified they had not known the solicitor. Some of these witnesses named one Jack Braun, others a man named Sirico, and still others a man or woman whose name they could not remember. In addition to Braun and Sirico, a man named Cappagrossa, and a woman who is said to have been Mrs. Sirico, were shown to have been engaged in the business of securing retainers for respondent's firm. Respondent himself admitted that he knew that Braun, Sirico and Cappagrossa had " recommended " cases to the firm. There is no doubt that respondent's firm was engaged in seeking out those with claims for personal injuries by paid runners and in violation of the Canons of Professional Ethics.

In three infants' cases it was proven that the firm retained fees in excess of the amount permitted by the court. In the Dorman case the infant's claim was settled for $1,000, and the court order allowing the settlement provided for the payment of $250 as attorney's fees. The parent's claim was settled for $500. On the basis of the fifty per cent retainer, there was due the parent $250, which, with the $750 coming from the settlement of the infant's claim,

made $1,000 due the parent and the guardian; but the testimony shows that the parent received for both claims about $800. In the Curry case the infant's claim was settled for $150, and the court order allowing settlement provided for the payment of $50 as the attorney's fees. The parent's claim was settled for $100, and on the basis of the retainer there was due the parent $50, which, with the $100 coming on the settlement of the infant's claim, made $150 due the parent and the guardian, but, in this case, the testimony is that the parent received $125. In the Sedlako case the infant's claim was settled for $150, and the order allowing settlement provided for the payment of $50 as attorney's fees. The parent's claim was settled for $150, out of which, after deducting the percentage due the attorneys on their retainer, there was $75 coming to the parent. This, with the $100 due on the settlement of the infant's claim, made $175 coming to the parent and guardian. The testimony is that $150 was paid to the parent and guardian.

The defense relied upon by respondent is that he never had anything to do with the negligence cases of the firm and took no part in any improper practices of the firm, if there were such improper practices.

Respondent's testimony is that at the time the partnership was entered into, it was understood that he would take care of the commercial, Surrogate's Court work, Magistrate's Court work, and the general office work, exclusive of negligence work, which he claims he knew little about and which was in the care of his partner, Oppenheim. Despite his testimony that he had nothing to do with drawing of papers in connection with the negligence work in the office there were produced from the office of the clerk of the Supreme Court of Bronx county, files in a series of negligence cases in which leave to compromise infants' claims was sought, which files disclose respondent as the affiant. In these cases he swore that he had caused a prior investigation to be made into the merits of the cause of action; that he subsequently caused the service of the summons and complaint to be made upon the defendant; that, pursuant to instructions given by petitioners, he had caused negotiations to be entered into with the defendant's representative looking toward a settlement of the action; that in his opinion the offer was fair and reasonable in view of the fact that the liabilities in the action were involved in considerable doubt, and in further view of the fact that the infant was not severely injured, all injuries having entirely passed away; that, in view of the circumstances of the case, he (respondent) was of the opinion that it would not promote the best interest of the infant to litigate the

cause of action and that it was for the best interest of the infant to compromise the same; that he had drafted the guardianship papers in the action for the appointment of the guardian *ad litem* of the infant plaintiff; that he had drawn a summons and had the same served upon the defendant; that he had drawn a complaint and had the same served upon the attorneys for the defendant; that he had caused investigation to be made concerning the occurrence of the accident and placed the case on the calendar of the court; that he had had a number of consultations and interviews with the guardian *ad litem*, as well as with the representatives of the defendant; that he had drafted the papers in the action for leave to compromise, and that he was of the opinion that the sums named in the respective affidavits were a fair and reasonable compensation for the services rendered and to be rendered by him.

Respondent's answer to this evidence is that these papers were intended to be signed by Oppenheim; that Oppenheim was away on his vacation at the time and one of the girls in the office requested respondent to sign the affidavits; that he did so as a matter of course without knowing the details and relying on the statements as contained in the affidavits and the explanation as to the correctness thereof, as certified by the stenographer in the office.

Miss Sally Chapoff, a stenographer in the employ of respondent's office from December, 1925, to September, 1928, testified before the referee. The following are extracts from her testimony:

By the Referee: " Q. State whether or not Mr. Helfant ever dictated to you any affidavits in the matter of a settlement of any of the infant negligence cases. A. He did. * * * "

By Mr. Marshall: " Q. Now, when you would take dictation from Mr. Helfant of those affidavits, did he tell you what fee to put in those affidavits? A. Why, yes."

It clearly appears, however, that the records produced from the county clerk's office were prepared at a time prior to Miss Chapoff's entrance into the employ of the firm. It also appears that such affidavits as were thus produced were verified in the summer of 1925, which lends plausibility to his story that they were intended for his partner. As to this, the referee said: " It is immaterial which of his contradictory oaths is true. The material fact is that one of them is false, and each hangs upon his interest rather than the truth. In 1925 it was his interest to obtain his share of the fees without waiting the return of his partner. So he made oaths that he had prepared the papers in each of those cases. Now it is his interest to make it appear that he had nothing to do with the negligence cases, and so he makes oath that he had never drawn any papers in them."

A great deal of testimony was given by respondent's former partner, Benjamin Oppenheim, regarding respondent's participation in the affairs of the partnership. We would be loath to condemn respondent on that testimony alone. The record aside from Oppenheim's testimony established that respondent knew about the printed retainers, and that he participated in the office work on negligence cases. The force of respondent's denial of any knowledge of wrongdoing on the part of the firm is destroyed by the proven falsity of his testimony. The referee said: "It is * * * submitted that his denial of knowledge of his firm's unprofessional conduct in obtaining the negligence cases should go for nothing. If he knew of such conduct, acquiesced in it, took his share of the fees, he shared in his partner's guilt, even though he may have personally employed runners to solicit the cases, which produced the fees." We cannot avoid the conclusion that respondent was well aware of the methods by which negligence cases were brought to his office.

On the question of his knowledge of the firm not complying with court orders fixing fees and making improper deductions in infants' cases, it was shown that he had access to the books of the firm, such as they were, that he drew on the earnings of the firm for his own account as he desired, and the fees of the firm were divided equally between himself and Oppenheim. No inquiry was made by him to verify the amount of fees allowed to his firm by court orders. He said he never checked the retainers in paying the money to his clients, and that he relied on the girls in the office to prepare the checks for him to sign. It appeared that originally the firm account was in respondent's individual name, but after some years it was changed to the name of both partners, each having power to draw. Respondent said no entries of deposits were made in the check book and the check book was never balanced, that he never looked over monthly statements, and to ascertain the balance the bank would be called on the telephone. In response to questions by the referee, respondent testified that he did not know it was his duty to keep a just and true account of all moneys collected for his clients. This method of dealing with moneys shows a complete disregard of his obligation to his clients and an indifference to the source of his money which is most amazing. He accepted his share of the moneys withheld from clients in disregard of court orders and cannot escape responsibility by closing his eyes to what was happening. The report of the referee should be confirmed and the respondent should be disbarred.

FINCH, McAVOY, MARTIN and O'MALLEY, JJ., concur.

Respondent disbarred.